Filed Mar. 16, 1894.

---------◆---------

No. 16,432.

## BROPHY ET AL. *v.* RICHESON ET AL.

REAL ESTATE.—*Riparian Owner.—Conveyance.—Non-Navigable Lake.*—
The S. E. fr. qr. sec. 21, T. 27 N., R. 1 W., was granted by patent from the State to S., and the same land was conveyed, by same description, by S. and wife to V. A part of said fractional quarter was covered by a part of a non-navigable inland lake.

*Held,* that by such conveyance V. was the owner of the whole of said quarter section, including the part covered by the lake.

SAME.—*Same.— Conveyance.—Description.*—V. conveyed to C. a part of said fr. qr. sec., described as follows: The N. fr. of S. W. qr. sec, 21, T. 27 N., R. 1 W., and the W. portion of the S. E. qr. of same section, both tracts being bounded on the south by said lake, and meandering along the water's edge eastward to a stake at the lake, low-water mark. V. conveyed to S. J. V. the following land of said qr. sec.: Commencing 100 rds. S. from the N. E. corner of said S. E. qr. sec., thence 74½ rds. W., thence south to the lake, thence S. E. along the margin of the lake to a point running directly east to the half section line, thence N. to place of beginning. V. having died, his heirs conveyed the S. ½ of the E. ½ of the S. E. qr. of said sec. 21, extending W. to the edge of the lake at low-water mark.

*Held,* that under the above conveyances made by V. and his heirs, the grantees do not hold as riparian owners, the bed of the lake being excluded by the description in the deeds.

From the Cass Circuit Court.

*J. C. Nelson* and *Q. A. Myers,* for appellants.

*M. Winfield, D. D. Dykeman, W. T. Wilson* and *G. C. Taber,* for appellees.

HOWARD, C. J.—Under the provisions of an act of Congress, approved May 29, 1830, vesting the title to certain lands in the State of Indiana, for the purpose of aiding in the opening of a canal to connect the waters of the Wabash river with those of Lake Erie, the Canal Commissioners of the State selected, among other such lands, "the S. E. fr. qr. sec. 21, T. 27 N., R. 1 W., containing 95 and 31 hundredths acres." On the first day of November, 1843, this tract was granted by patent from the State to John Stevens, and on the 3d day of November, 1849, John Stephens and wife conveyed the land by the same description to Peter R. Vanatta, through whom all the parties to this action derive title.

The plat of the original government survey of the S. E. fr. qr. sec. 21 shows that the $95\frac{31}{100}$ acres named lie north and east of the meander line of a pond or lake, known in the record as Lake Cicott. South of the lake, however, and lying between the lake and the south line of the quarter section, is a small projection of dry land said to contain ninety-eight hundredths of an acre.

In *Stoner* v. *Rice, Auditor,* 121 Ind. 51, it is laid down as the rule in this State that "the owner of lands bordering on a non-navigable inland lake, such as the one described in this case, when the subdivisions of the land are surveyed by running a meander line between the dry land and the water to ascertain the number of acres of dry land, and designating such subdivision as a frac-

tional quarter or lot, giving the number of acres of dry land, takes the title to all the land contained within the subdivision. He takes as a riparian owner, and his title includes, and he owns, the land beneath the lake far enough beyond the meander line and water's edge to make out the full subdivision in which his land is so situated.'' See also *Clute* v. *Fisher*, 65 Mich. 48, where the same rule is observed.

Following this rule, we conclude that the deed to Peter R. Vanatta for the S. E. fractional quarter of section 21, conveyed title to the whole quarter section, including the part thereof covered by the waters of the lake, and also the ninety-eight hundredths of dry land south of the lake.

On the 2d day of November, 1850, Peter R. Vanatta conveyed to one James Vanatta forty acres in the northeast corner of said quarter section by metes and bounds. No part of this land touches the lake, and the title to the land so conveyed is not in controversy.

On the 2d day of July, 1857, Peter R. Vanatta, who also owned lands in the S. W. quarter of said section 21, made a deed to one Martin V. Carney of parts of both quarter sections, described as follows:

''The north fractional of S. W. qr. sec. 21, T. 27 N., R. 1 W. Also the west portion of the S. E. qr. of the same section 21, T. 27 N., R. 1 W., both tracts bounded on the south by Cicott's lake, and meandering along the water's edge eastward to a stake at the lake, low-water mark, ten and one-half rods west of land belonging to James Vanatta, then running north to a stake on the half section line and parallel to land now owned by James Vanatta, and ten and a half rods distant from it, containing, in all, one hundred and twenty-six acres and two-hundredths of an acre, according to Vanness' survey.''

On the 19th day of July, 1880, Peter R. Vanatta conveyed to Sarah J. Vanatta the following parcels of land:

"That tract or parcel of land commencing at a point sixty-four rods west from the northeast corner of the S. E. qr. sec. 21, T. 27 N., R. 1 W., thence running ten and one-half rods west, thence south one hundred rods, thence east ten and one-half rods, thence one hundred rods north to the place of beginning, containing six acres and fifty-six hundredths of an acre; also a parcel of land commencing one hundred rods south from the northeast corner of the above S. E. qr. section, thence running seventy-four and one-half rods west, thence south to Lake Cicott, thence southeast along the margin of the lake to a point running directly east to the half section line, thence north to the place of beginning, inclosing an area of three acres and fifty-four hundredths, making, in all, ten acres."

On the 2d day of January, 1886, Peter R. Vanatta having died, his heirs made a deed to Simon P. Loutz of the following:

"That fractional part or parcel of the south one-half of the east half of the S. E. qr. sec. 21, T. 27 N., R. 1 W., being that part or parcel of land lying along the section lines bounding section 21 on the south and east, extending from the section line bounding section 21 on the east, west, thence to the edge of Lake Cicott, to low-water mark, in all, nine and forty-five one-hundredths acres, be the same more or less."

Other deeds were made by said heirs to Sarah J. Vanatta, seemingly intended to correct defects in the conveyance to her made by Peter R. Vanatta.

Under the deeds so made by Peter R. Vanatta and his heirs, the appellees claim title to the land covered by the waters of the pond known as Lake Cicott.

In 1875, the land inside the meander line of the lake,

from which the water had then in part receded, was surveyed under direction of the United States government by the appellant Brophy, who was appointed deputy United States surveyor for that purpose; and said appellant received from the United States a patent for the land so surveyed. Under this patent the appellants entered into possession, and engaged in the cutting of ice from the lake, and in the storing of it in houses erected by them upon the lands so held.

In February, 1890, the heirs of Peter R. Vanatta made to the appellant John C. Brophy a quitclaim deed to the lands within the meander so held under the patent, and described as follows:

"All that part of the S. E. qr. sec. 21 N., R. 1 W., not heretofore sold and conveyed by our husband and father, in his lifetime, to Martin V. Carney and James Vanatta, or by us, since his death, conveyed to Simon P. Loutz and Sarah J. Vanatta."

As the deed to Peter R. Vanatta, under date of November 3, 1849, for the "S. E. frac. qr. of sec. 21," conveyed to him, according to the rule already stated, the full title to all of the southeast quarter of said section, it is evident that the resurvey made in 1875, and the patent based upon that survey and issued to John C. Brophy, could give to appellants no title; and we do not understand that since the decision in the case of *Stoner* v. *Rice, Aud., supra*, they claim under that patent.

Appellants contend, however, that under that patent from the United States they had color of title, and in good faith entered into possession of the lands purported to be conveyed by it, and made valuable improvements thereon; and that at the beginning of this suit they were in such possession, and had been for fifteen years prior thereto.

Under the deed from the Vanatta heirs, however, made

February 27, 1890, appellants claim title to all the lands within the meander of the lake, and including the dry land and its accretions on the south side of the lake.

This action was in ejectment and to quiet title, and was brought by appellees, who claimed, as riparian owners, to be entitled to recover all the lands of the S. E. qr. of sec. 21, as formerly owned by Peter R. Vanatta.

The cause was submitted to a jury, who returned a verdict for the appellants, upon which judgment was rendered in their favor.

There was a new trial as of right under the statute, and also a change of venue from the judge.  The second trial resulted in a verdict and judgment for the appellees, except as to the land south of the lake, which was awarded to the appellants.

As the appellees must succeed, if at all, upon the strength of their own title, it will be sufficient for the decision of this case to examine the claims of appellees to the lands in dispute.

Appellees claim that their deeds make them riparian owners, and that as such they own to the center of the lake, if not to the south line of the quarter section in which their lands are situated.   In making this claim appellees admit that "it was in the power of Peter R. Vanatta, the owner of this quarter section, in conveying any part of it, to have reserved by apt words in his deed the whole lake or any part of it, or his riparian rights, or any other appurtenant right, but this must be done by express and unmistakable language."   The issue for our decision is thus clearly suggested.   The words of description in the Vanatta deeds must decide the question by determining the intent of the grantor at the times of making the conveyances.

If a stream or highway, simply without any modifying words, is made a boundary in a deed, and the grantor

owns the fee of such stream or highway, there is no doubt that title is carried to the thread of the stream or the middle of the highway.

In *Morrison* v. *Keen*, 3 Me. 474, it was said, "land granted as bounded by a river extends to the thread of the river, unless from prior grants on the other side of the river, such a construction is negatived."

In the case of *Ross* v. *Faust*, 54 Ind. 471, Judge Perkins, speaking for this court, said: "The conveyance to a riparian proprietor may be drawn in terms so restrictive as to limit his title to the bank as a boundary, when, but for such restrictions, it would extend to the thread of the stream."

In a note to *Chandos, Admr.*, v. *Mack* (Wis.), 10 L. R. A. 207, it is said: "If the stream is mentioned as the boundary in general terms, or the land is described as 'bounded,' or 'running along' a river, the stream will be held to be the monument and the thread of the stream is the boundary line. * * * But if the land is described as bounding on the bank or shore of the stream, then the low-water mark on the bank will be the boundary. The particular reference to the bank excludes the stream. *Bradford* v. *Cressey*, 45 Me. 9; *Child* v. *Starr*, 4 Hill, 369; *Halsey* v. *McCormick*, 13 N. Y. 296; *Babcock* v. *Utter*, 1 Abb. App. Dec. 27; *Dunlap* v. *Stetson*, 4 Mason, 349; *Daniels* v. *Cheshire R. Co.*, 20 N. H. 85; *Martin* v. *Nance*, 3 Head, 650; *Watson* v. *Peters*, 26 Mich. 516."

The boundary line between the States of Georgia and Alabama is described as "beginning on the western bank of the Chattahoochee river," "running thence up the said river Chattahoochee and along the western bank thereof."

The Supreme Court of the United States, in the case of *Howard* v. *Ingersoll*, 54 U. S. 380, in defining the boundary thus indicated, said that the words "along the

western bank thereof,'' limited the effect and operation of the other words of the description, ''and excluded the bed of the river.''

So, in the case of *Handly* v. *Anthony*, 18 U. S. 374, the words ''northwest of the river Ohio,'' used in the Virginia grant, were held to restrict the boundary of the northwestern territory to the low-water mark on the northwest bank of the Ohio river.

As to boundaries by streams or highways, it is laid down by Chancellor Kent, as the general rule, ''that a grant of land bounded upon a highway or river, carries the fee in the highway or river to the center of it, provided the grantor at the time owned to the center, and there be no words or specific description to show a contrary intent. But it is competent for the owner of a farm or lot, having one or more of its sides on a public highway, to bound it by express terms on the side or edge of the highway, so as to rebut the presumption of law, and thereby reserve to himself his latent fee in the highway. It is equally competent for the riparian proprietor to sell his upland to the top or edge of the bank of a river, and to reserve the stream, or plats below high-water mark, if he does it by clear and specific boundaries. The purchaser, in such a case, takes the bank of the river as it is, or may thereafter be, by alluvion or decrease of the flow of the river. He takes it subject to the common incidents which may diminish or increase the extent of his boundaries. He may also convey the bed of the stream separate from the land which bounds it.'' 3 Kent's Comm. 434.

In *Allen* v. *Weber*, 80 Wis. 531, the court decided that the grantees of a strip of land described in their deed as bounded on the east by the low-water mark on the west side of a river, took no title to any part of the bed of the stream beyond such low-water mark.

As to streams and highways, then, the rule seems to be that if the stream or highway, simply and without modifying words, is named as the boundary, the title is taken to the middle of the stream or highway, provided the grantor's title extend so far; but if the bank, or edge, or low-water mark, or high-water mark, of the stream, or the edge or line of the highway, or other clearly defined line along the stream or highway, is given as the boundary, then the title will not be carried beyond the boundary so defined.

As to non-navigable ponds or lakes, it will be found that the rule as to riparian proprietorship must be still further modified.

In *Edwards* v. *Ogle*, 76 Ind. 302, it appeared that the Wabash and Erie Canal had received a grant from the United States of a tract of thirty-nine acres, described as "the south west fraction of section six," a part of the boundary of which, as run under direction of the surveyor-general of the United States, meandered along a marshy pond. This tract, by an unbroken chain of deeds, became the property of Edwards, who claimed to the center of the pond by virtue of his rights as riparian owner,—"that, inasmuch as his tract of thirty-nine acres bordered on the marshy pond, his title extended to the center of the pond." This court, however, decided that Edwards took only his thirty-nine acres, as bounded by the meander line.

In the case of *State* v. *Portsmouth Savings Bank*, 106 Ind. 435, it appeared that Beaver lake was surrounded on all sides by swamp lands. These lands had been surveyed and platted by authority of the general government, and were subject to private entry. In making the survey, the same was extended around the lake to its margin, and a meandering line established. These border lands, by the government subdivisions, were patented to

the State; and the marginal fractional forty acre tracts, constituting the contour and rim of land around the lake, were purchased from the State.    The purchasers claimed title, as riparian owners, to the center of the lake; but this court denied such riparian claim.

In the case of *Stoner* v. *Rice, Auditor, supra,* which was, like this, a case where there was a controversy as to the title to the land covered by the waters of a lake, it was contended  that the riparian owner bordering on a non-navigable lake, as in the case of a river, takes to the thread or center of the lake; but this court declared such rule impracticable when applied to lakes; and that "where the body of water is surrounded by land, and is almost circular in form, covering a quarter or half section, or more, of land, with riparian owners on either side, we can not say that the owners on the east and the west would take, to the exclusion of those upon the north and south, nor *vice versa,* nor would it do, as it seems to us, to apply a doctrine that would require the running of diagonal lines between the various owners, each reaching to the center of the lake."

These words might have been written to apply to the case before us, fitting it, as they do, quite as well as the case in which they were written.

In the light of  the foregoing authorities it seems very clear that it was not the intention of Peter R. Vanatta or his heirs, in making the deeds under which appellees claim, to convey any lands within the margin of the lake.

The first deed, that to Martin V. Carney, conveys "the west portion of the southeast quarter of section 21."    If the grantor had said "the west half," or "the west quarter," or any other definite division of the quarter section, there is no doubt that, under the rule in *Stoner* v. *Rice, Aud., supra,* it would have been a conveyance

of the part of the land under the lake, as well as the dry land included in the description. But "the west portion" of the quarter section has no definite meaning in itself, and can only be given meaning by the particular description which follows: "Bounded on the south by Cicott's lake, and meandering along the water's edge eastward to a stake at the lake, low-water mark." It seems to us that these words plainly limit the southern boundary to the line "along the water's edge eastward to a stake at the lake, low-water mark." More apt words of description could hardly have been chosen.

In *Allen* v. *Weber, supra,* the Supreme Court of Wisconsin said, of a similar description: "There could be no language of description more clearly indicating the exact line than is found in the conveyances of this strip of land: 'To low-water mark; thence northerly along the low-water mark.' This language could have no other meaning than to indicate the intention of the grantors to limit the premises, and establish their boundary at that line, 'along low-water mark.' "

But, in the Carney deed, in addition to the description by metes and bounds, at the close of the description are the words, "according to Vanness' survey." No question is made of the existence of this survey, or of the fact that it included only land on the north of the lake. But appellees contend that the reference to the survey, as made in the deed, has relation only to the number of acres conveyed, and not to the boundaries.

If this were true, we can hardly see how it would help appellees. If the boundaries were uncertain "the number of acres, according to the survey," would certainly be an indication as to the location of the true boundary line within which those acres were contained, especially in a case like this, where there is no dispute as to the boundary except as to one side. But we are of opinion

that the words, "according to Vanness' survey," occurring, as they do, at the end of, and in immediate connection with, the description of the land, refer to the whole description, and are a part of it. The rule is that a survey or plat referred to in a deed becomes a part of it, as if it were written in the deed. See note to *Heaton* v. *Hodges*, 30 Am. Dec. 731 (741), and authorities there cited.

In the case before us, not only was the survey referred to in the deed, but such reference, not to the acres only, but to "the line known as the Vanness' survey, referred to in the Vanatta deed to Martin V. Carney," was expressly made part of the verdict of the jury, and of the judgment of the court, which appellees seek to uphold. It is very clear that the deed to Martin V. Carney conveyed no land not included within the lines of the Vanness survey.

The descriptive words in dispute in the other deeds are subject to like interpretation to those in the Carney deed, except that there is no reference to a survey. They are all by metes and bounds. The description in the deed to Sarah J. Vanatta, after naming the starting point, reads: "Thence running 74½ rods west, thence south to lake Cicott, thence southeast along the margin of the lake to a point running directly east to the half-section line, thence north to the place of beginning, including an area of $3\frac{54}{100}$ acres." Here, the starting point, the point at the end of the 74½ rods west, the point south of the latter, at the edge of the lake, and the boundary, "southeast along the margin of the lake," are all fixed definitely. The remainder of the description, "to a point running directly east to the half-section line," is indefinite; and the south line of this parcel would be unknown, were it not that, perhaps, the words, "including

an area of $3\frac{54}{100}$ acres," might enable a surveyor to find it. It is very clear, though, that none of the lake bed passed by this description.

The only words in the description in the Loutz deed that bear any relation to the lake, are, "west thence to the edge of lake Cicott, to lower water mark." Here, too, without doubt, the bed of the lake is excluded.

Peter R. Vanatta was the owner of the whole of the S. E. qr. sec. 21, T. 27 N., R. 1 W.; and he and his heirs had the undoubted right to dispose of it as they saw fit. By the deeds in the record it appears that they did so dispose of it that the appellees are the owners of that part of it included in "the Vanness' survey," and, also, of the Sarah J. Vanatta and Simon P. Loutz tracts, the latter two to low-water mark; and that the remainder of the said quarter section, including the bed of the lake, the land between "the Vanness survey" and the lake, and, also, that between the lake and the south line of the said quarter-section, belongs to appellants.

As the deeds must control, it follows that the verdict is not sustained by sufficient evidence, and is contrary to law. Other questions discussed by counsel are such that their decision is unnecessary, and would serve no useful purpose.

The judgment is reversed, with directions to grant a new trial, and for further proceedings in accordance with this opinion.

Filed Feb. 13, 1894.